Roger ATKINSON, Polly Atkinson, and Roger and Polly Atkinson as guardians ad litem for Chad Atkinson, Plaintiffs and Appellants,

v.

IHC HOSPITALS, INC., aka Intermountain Health Care, Hospitals, Inc., a corporation, Scott Olsen, Stephen G. Morgan, Morgan, Scalley & Reading, and John Does I through X, Defendants and Appellees.

No. 880310.

Supreme Court of Utah.

July 3, 1990.

Rehearing Denied Sept. 25, 1990.

Dale F. Gardiner, Robert J. Debry, Gordon Jensen, Salt Lake City, for plaintiffs and appellants.

Paul S. Felt, Salt Lake City, for Scott Wetzel Services and Scott Olsen.

B. Lloyd Poelman, Salt Lake City, for Intermountain Health Care Hospitals, Inc.

Carman Kipp, Heinz J. Mahler, Salt Lake City, for Stephen G. Morgan and Morgan, Scalley & Reading.

HALL, Chief Justice:

Plaintiffs appeal from summary judgment granted to all defendants in the Third Judicial District Court, Salt Lake County. The trial court determined that no genuine issues of material fact existed with respect to plaintiffs' complaint for legal malpractice, fraud, and negligent misrepresentation. We affirm.

Polly Atkinson and Roger Atkinson ("the Atkinsons") are the parents and guardians ad litem of Chad Atkinson, a minor, who was born on March 2, 1983. On March 4, 1983, while still in Primary Children's Medical Center, Chad aspirated digestive material that filled his lungs, causing a lack of oxygen (anoxia), which resulted in permanent brain damage. It is alleged that a nurse shut off the warning device monitoring Chad prior to the incident.

After the injury, defendant Intermountain Health Care, Inc. ("IHC"), initiated negotiations with the Atkinsons through IHC's insurance adjuster, Scott Wetzel Services, Inc. ("Wetzel"). Scott Olsen, an employee of Wetzel, met with the Atkinsons four or five times to discuss Chad's condition and possible settlement terms. After the terms, conditions, and amounts of the settlement had been fully agreed upon, Wetzel retained an attorney, Steve Morgan, for the purpose of drafting the documents necessary for presentation to the probate court for approval of the settlement as required by law for all settlements involving minors.[1] The Atkinsons claim that they understood Morgan to be their attorney and that he acted in that capacity for them in explaining the terms of the agreement and appearing on their behalf in the

probate court proceeding where the Atkinsons were appointed guardians of Chad.

The Atkinsons were considered adults at the time of Chad's birth and during the settlement by reason of their marriage.[2] Neither Roger nor Polly had progressed beyond the tenth grade, nor are they presently high school graduates. They were, however, assisted in the settlement negotiations by Roger's father, George Atkinson, who was a union negotiator and who prepared a ten-page counterproposal.

The Atkinsons settled on a total amount of $1,280,000, assuming a normal life of 65 years for Chad. The settlement was structured, with payments to be spread out over a number of years, and had a present-day value of $118,000.

In the trial court, the Atkinsons claimed that the settlement was insufficient, that they were not adequately represented by Steve Morgan, and that IHC and Wetzel misrepresented to them the severity of Chad's injuries. The trial court granted all of defendants' motions for summary judgment, and the Atkinsons appeal that order.

This court has held, "Summary judgment is appropriate if the pleadings and all other submissions show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[3] Our review on appeal requires a determination of the existence of any issues of material fact with regard to (1) whether attorney Steve Morgan owed a duty to the Atkinsons or acted in a representative capacity, and (2) whether the settlement and release obtained by Wetzel for IHC was done so by means of fraud or negligent misrepresentation.

## I. ATTORNEY–CLIENT REPRESENTATION

The Atkinsons claim that attorney Steve Morgan represented them throughout the probate hearings to approve the settlement and management of Chad's estate. The

1. *See* Utah Code Ann. §§ 75–5–401 to –433 (1978).

2. Utah Code Ann. § 15–2–1 (1953).

3. *Heglar Ranch, Inc. v. Stillman*, 619 P.2d 1390, 1391 (Utah 1980); *see also* Utah R.Civ.P. 56(c).

Atkinsons present four theories upon which they believe that Mr. Morgan assumed the duty to represent their interests: (1) implied contract, (2) limited attorney-client relationship, (3) third-party liability, and (4) volunteer legal advice.

## A. Implied Contract and Limited Attorney–Client Relationship

■ The record is clear that the Atkinsons did not consider Morgan their attorney at any time during his involvement in the probate proceedings. Despite the fact that Scott Olsen, manager of Wetzel, suggested that Morgan's services be utilized to prepare the necessary documents for the probate hearing, there are a number of indicators which confirm that the Atkinsons did not rely on Morgan's experience, skill, or expertise with regard to the adequacy of the settlement.

First, all of the pleadings and documents that were prepared and filed by Morgan indicated clearly that Morgan was representing IHC, not the Atkinsons. The Atkinsons had an opportunity to review the documents and apparently did discuss the settlement with an attorney of their choosing.

Second, there was no contract of employment or retainer agreement between the Atkinsons and Morgan. They did not hire Morgan, nor did they pay for any services performed. Rather, it is clear from the record that Morgan was hired by IHC, which in turn paid for his services.

Third, the probate judge asked Mrs. Atkinson directly about her legal representation while Morgan was in the courtroom participating in the hearing:

THE COURT: Have you sought the advice of legal counsel in this matter?

MRS. ATKINSON: I have talked to someone about it, but we are not planning on getting a lawyer.

THE COURT: Have you talked to a lawyer?

MRS. ATKINSON: Yes. I've just asked him a few things about it, and he said that we really should not—we shouldn't have to sue them if they are giving us an offer.

It is thus clear that the Atkinsons exercised the right which was theirs to represent themselves and to proceed without the benefit of counsel. It is equally clear that they did not consider Morgan to be their attorney and that they did not seek his advice with respect to the merits of the settlement agreement. In the absence of an attorney-client relationship, Morgan owed no implied contractual duty to the Atkinsons, nor did there exist a limited attorney-client relationship.

## B. Third–Party Liability

■ The Atkinsons next claim is that Morgan owed them a duty under a theory of third-party liability. We have yet to fully address the theory of third-party liability, and we have not allowed recovery in any of the cases where third-party liability was in issue.[4]

Cases cited by the Atkinsons from other jurisdictions state that in order to establish a cause of action under this theory, the Atkinsons must

allege and prove that the intent of the client to benefit the nonclient was a direct purpose of the transaction or relationship. In this regard, the test for third party recovery is whether the intent to benefit actually existed, not whether there could have been an intent to benefit the third party.[5]

Indeed, the third-party liability theory "does not supplant entirely the strict privity rule, but instead operates as a limited exception to that rule."[6] Cases utilizing the third-party liability theory involve

---

4. See *Hughes v. Housley*, 599 P.2d 1250 (Utah 1979) (second attorney was not liable to the first attorney in negligently handling a motion for relief from default); *Milliner v. Elmer Fox & Co.*, 529 P.2d 806 (Utah 1974) (attorneys who prepared corporate document for filing with securities & exchange commission not liable to purchasers of shares).

5. *Flaherty v. Weinberg*, 303 Md. 116, 492 A.2d 618, 625 (1985).

6. *Id.* 492 A.2d at 624.

drafting and administering wills and estates,[7] fraudulent misrepresentations,[8] creditors of a corporation in receivership,[9] purchasers at a foreclosure sale where attorneys conducted the sale improperly,[10] and giving a legal opinion on a bond.[11] Indeed, "any duty owed by an attorney to a third party is derivative of the duty owed by that attorney to his client." [12]

The instant case is nothing like the other cases adopting the third-party liability theory. The settlement of a potential claim or a lawsuit is not the kind of benefit envisioned in the third-party liability theory. Despite the fact that IHC and the Atkinsons had reached a settlement agreement, they were still potential adversaries in litigation.

Morgan, who had a contractual duty to represent IHC, had no corresponding duty to assure that the settlement for the Atkinsons was sufficient to fit their needs. The basis of our judicial system is the adversarial model, a concept which is foreign to the placement of a duty upon counsel to represent the best interests of both sides. The third-party liability theory is thus inapposite to the factual context of the instant case.

### C. Volunteer Legal Advice

■ The Atkinsons' final claim against Morgan is that by offering volunteer legal advice he undertook a duty to act in their best interests. The "legal advice" Morgan gave was an explanation of the probate documents, specifically the order approving settlement of a minor's claim. Morgan testified: "I read that document to them and explained to them that in order for the

court to approve and sign this Order, that the court would have to find that the settlement in all respects was fair." Not only is the above a true statement of the law,[13] but also the court approved the settlement upon Mr. Atkinson's statement that he believed it to be fair:

THE COURT: And your name, sir?

MR. ATKINSON: Roger W. Atkinson.

THE COURT: Are you the father of the child?

MR. ATKINSON: Yes.

THE COURT: Do you believe that you, on behalf of the child, have a claim against Intermountain Health Care?

MR. ATKINSON: Yes, I do.

THE COURT: It's my understanding that there's a structured settlement of a total payout of $900,000?

MR. ATKINSON: Yes, sir.

THE COURT: Do you feel that this is adequate?

MR. ATKINSON: Yah, I do, considering the hospitalization and everything like that will be covered.

THE COURT: Do you feel this is in the best interest of the child?

MR. ATKINSON: I do.

THE COURT: All right. I will approve the settlement.

The Atkinsons cite no cases on point for the proposition that "[a]n attorney who gives gratuitous advice will be held to the same standard of care as if he were under formal retainer." [14] While some jurisdictions have recognized a cause of action when legal advice was volunteered, we have yet to address this issue. Nevertheless, we find the cases cited by the Atkin-

---

7. *Kirgan v. Parks,* 60 Md.App. 1, 478 A.2d 713, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984).

8. *McElhanon v. Hing,* 151 Ariz. 386, 728 P.2d 256 (Ct.App.1985), *affirmed in part, vacated in part,* 151 Ariz. 403, 728 P.2d 273 (1986), *cert. denied,* 481 U.S. 1030, 107 S.Ct. 1956, 95 L.Ed.2d 529 (1987); *LaFountaine v. State Farm Mut. Auto. Ins.,* 215 Mont. 402, 698 P.2d 410 (1985).

9. *Prescott v. Coppage,* 266 Md. 562, 296 A.2d 150 (1972).

10. *Clagett v. Dacy,* 47 Md.App. 23, 420 A.2d 1285 (1980).

11. *Bradford Securities Processing Servs., Inc. v. Plaza Bank and Trust,* 653 P.2d 188 (Okl.1982).

12. *Franko v. Mitchell,* 158 Ariz. 391, 762 P.2d 1345, 1354 (App.1988); *see also Fickett v. Superior Court of Pima County,* 27 Ariz.App. 793, 558 P.2d 988 (1976).

13. Utah Code Ann. § 75–5–409(2) (1978).

14. *Franko,* 762 P.2d at 1351.

sons to be easily distinguishable from the present case, where an explanation of the probate proceedings was incumbent upon Morgan. Morgan's explanation of the probate proceedings, when viewed in the concept of this case, did not constitute the rendering of legal advice.

It is clear that the Atkinsons did not consider Morgan to be their attorney, nor did they rely upon Morgan or the probate judge to evaluate the fairness of the settlement. The Atkinsons made an independent evaluation of the settlement and concluded that it was fair. We therefore affirm the trial court's determination that there is no genuine issue of material fact with regard to a legal malpractice claim against Morgan.

## II. FRAUD AND MISREPRESENTATION

■ The Atkinsons' second claim is that the terms and conditions of the settlement agreement and Chad's condition were fraudulently or negligently misrepresented to them. More specifically, the Atkinsons claim that the settlement was inadequate in light of Chad's condition and that because of their age and inexperience, defendants took advantage of them as Chad's guardians.

First, the Atkinsons assert that IHC and Wetzel misrepresented Chad's true condition by telling them that Chad was "all right" and would be a "normal child." We find this assertion to be wholly inconsistent with the record and thus without merit. It is factually clear that the child's condition was not normal and that the child was not all right. Such conditions are what prompted the settlement reached of all claims for a total of $1,280,000.

Second, the Atkinsons' underlying argument is that they were fraudulently induced or negligently misled into agreeing to an inadequate settlement for Chad. The Atkinsons were considered adults and did not enter into the settlement agreement with their eyes closed. As hereinabove noted, it is clear from the record that the Atkinsons intentionally and advisedly declined to retain legal counsel, relying instead upon the assistance of George Atkinson, Roger's father, a union negotiator who formulated a ten-page counterproposal for the settlement. The transaction does not have the appearance of having been made other than at arm's length.

■ We have heretofore defined fraud as "a false representation of an existing material fact, made knowingly or recklessly for the purpose of inducing reliance thereon upon which the plaintiff reasonably relies to his detriment."[15] Negligent misrepresentation is a form of fraud which occurs when

[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by the justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.[16]

It appears from the record that the Atkinsons were fully informed that the extent of Chad's brain damage was not yet determinable or certain. The unchallenged language of the release that the Atkinsons read and signed unequivocally stated: "The undersigneds hereby declare and represent that the injuries sustained by Chad Atkinson are or may be permanent and progressive and that recovery therefrom is uncertain and indefinite...."

Also undisputed is the fact that Wetzel offered to send Chad to a specialist in Arizona for tests to evaluate the extent of the brain damage before settlement. In addition, Wetzel offered to wait until the full extent of the brain damage was known before solidifying the terms of the settle-

**15.** *Sugarhouse Finance Co. v. Anderson,* 610 P.2d 1369, 1373 (Utah 1980); *see also Taylor v. Gasor, Inc.,* 607 P.2d 293, 294 (Utah 1980); *Masters v. Worsley,* 777 P.2d 499, 501–02 (Utah Ct. App.1989); *Conder v. A.L. Williams & Assoc., Inc.,* 739 P.2d 634, 637 (Utah Ct.App.1987).

**16.** Restatement (Second) of Torts § 552 (1977).

ment. The Atkinsons refused both of these proposals, opting instead to obtain an immediate settlement.

Furthermore, the trial court questioned the Atkinsons extensively regarding their comprehension of Chad's condition and the implications of the settlement:

> THE COURT: Do you understand that by settling this case, and regardless of what later transpires, when you find out later that the child's injury is worse than you anticipated, and on the other hand even if it's better, that you will not ever be able to come back against Intermountain Health Care? Do you understand that?
>
> MRS. ATKINSON: Yes, sir, I do.

For the aforementioned reasons, we conclude that the probate hearing was conducted in a jurisprudential manner and that the Atkinsons participated with full knowledge of Chad's rights and the implications of their actions upon any future causes of action against IHC or Wetzel.

Furthermore, the release signed by the Atkinsons was done with full knowledge of Chad's rights, which has the effect of barring this cause of action. The release signed by the Atkinsons acquits IHC and their agent, Wetzel,

> from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever ... on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen bodily and personal injuries ... resulting or to result from the accident....

We affirm the trial court's determination that, as a matter of law, no genuine issue of material fact exists with regard to the Atkinsons' allegations of fraud and negligent misrepresentation.[17] We have duly considered the Atkinsons' other claims and find them to be without merit.

Affirmed.

17. The rule on summary judgment may apply even when some fact remains in dispute; we affirm summary judgment when all material facts are not *genuinely controverted. See Heglar Ranch,* 619 P.2d at 1391.

HOWE, Associate, C.J., and STEWART, DURHAM and ZIMMERMAN, JJ. concur.